UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| PHAYVANH VIXAYSACK FRICHITTAVONG, | ) ) ) |
| *Plaintiff* | ) ) ) |
| v. | ) No. 2:11-cv-444-JAW ) |
| MICHAEL J. ASTRUE, **Commissioner of Social Security,** | ) ) ) |
| *Defendant* | ) ) |

### *REPORT AND RECOMMENDED DECISION*[1]

This Social Security Disability ("SSD") appeal raises the question of whether the administrative law judge supportably found that the plaintiff was capable of performing past relevant work as a food service manager, work which did not require the performance of work-related activities precluded by her residual functional capacity ("RFC"). The plaintiff seeks reversal and remand on the bases that the administrative law judge erred in (i) failing to give controlling weight to the opinions of a treating physician, Joseph Martinez, M.D., and (ii) ignoring her work record in finding her subjective complaints of pain and fatigue not entirely credible. *See* Plaintiff's Memorandum in Support of Reversal of Commis[s]ioner's Denial of

---

[1] This action is properly brought under 42 U.S.C. § 405(g). The commissioner has admitted that the plaintiff has exhausted her administrative remedies. The case is presented as a request for judicial review by this court pursuant to Local Rule 16.3(a)(2)(A), which requires the plaintiff to file an itemized statement of the specific errors upon which she seeks reversal of the commissioner's decision and to complete and file a fact sheet available at the Clerk's Office. Oral argument was held before me on June 22, 2012, pursuant to Local Rule 16.3(a)(2)(C), requiring the parties to set forth at oral argument their respective positions with citations to relevant statutes, regulations, case authority, and page references to the administrative record.

Benefits ("Statement of Errors") (ECF No. 12) at 17-25. I find no reversible error and, accordingly, recommend that the court affirm the decision.

Pursuant to the commissioner's sequential evaluation process, 20 C.F.R. § 404.1520; *Goodermote v. Secretary of Health & Human Servs.*, 690 F.2d 5, 6 (1st Cir. 1982), the administrative law judge found, in relevant part, that the plaintiff had severe impairments of status post meningioma resection, status post frozen left shoulder, left-sided paresthesia status post symptoms of hemiparesis, seizure disorder, insomnia, and chronic pain, Finding 3, Record at 17;[2] that she retained the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except that she could stand/walk for four hours in an eight-hour workday and sit for six hours in an eight-hour workday, should not constantly use her left foot for controls, should never climb ladders or balance but could occasionally climb stairs/ramps and stoop, kneel, crouch, and crawl, should perform no overhead work with her left arm but otherwise had an unlimited ability to reach, handle, finger, and feel, and should avoid moderate exposure to hazards, Finding 5, *id*. at 20; that she was capable of performing past relevant work as a food service manager, which did not require the performance of work-related activities that were precluded by her RFC, Finding 6, *id*. at 26; and that she, therefore, was not disabled from September 20, 2008, her alleged date of onset of disability, through June 14, 2011, the date of the decision, Finding 7, *id*. at 27-28.[3] The Appeals Council declined to review the decision, *id*. at 1-3, making it the final determination of the commissioner. 20 C.F.R. § 404.981; *Dupuis v. Secretary of Health & Human Servs.*, 869 F.2d 622, 623 (1st Cir. 1989).

---

[2] The administrative law judge mistakenly referred to the plaintiff as suffering from "parathesis," rather than "paresthesia." Finding 3, Record at 17. The error is harmless.
[3] To obtain SSD benefits, a claimant must demonstrate that he or she was disabled on or before his or her date last insured for such benefits. *See, e.g., Mueller v. Astrue*, 561 F.3d 837, 840 (8th Cir. 2009). In this case, the plaintiff is insured for SSD benefits through December 31, 2013. *See* Finding 1, Record at 16.

The standard of review of the commissioner's decision is whether the determination made is supported by substantial evidence. 42 U.S.C. § 405(g); *Manso-Pizarro v. Secretary of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). In other words, the determination must be supported by such relevant evidence as a reasonable mind might accept as adequate to support the conclusion drawn. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

The administrative law judge reached Step 4 of the sequential evaluation process, at which stage the claimant bears the burden of proving inability to return to past relevant work. 20 C.F.R. § 404.1520(f); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). At this step, the commissioner must make findings of the plaintiff's RFC and the physical and mental demands of past work and determine whether the plaintiff's RFC would permit performance of that work. 20 C.F.R. § 404.1520(f); Social Security Ruling 82-62, reprinted in *West's Social Security Reporting Service* Rulings 1975-1982 ("SSR 82-62"), at 813.

## I. Discussion

### A. Treatment of Treating Source Opinions

The plaintiff first contends that the administrative law judge erred in failing to give controlling weight to the opinions of Dr. Martinez. *See* Statement of Errors at 19-24. I find no reversible error.

Dr. Martinez was the plaintiff's primary care physician as of September 20, 2008, when she suffered a seizure that led to a diagnosis of a right frontal brain tumor, or meningioma. *See* Record at 293. She underwent surgery to remove the tumor, followed by an inpatient admission to a rehabilitation hospital. *See id.* Following the surgery, she had left hemiparesis, or weakness affecting one side of the body, which subsequently resolved to monoparesis, or partial paralysis

of her left lower extremity. *See id*.; Stedman's Medical Dictionary 800, 1129, 1316 (27th ed. 2000).

As of October 29, 2008, the plaintiff was noted to have good to normal strength in both upper extremities and in her right lower extremity but residual weakness in her left lower extremity, for which she was prescribed a continuation of physical and occupational therapies upon her discharge from rehabilitation. *See id*. at 295. From that point forward, Dr. Martinez oversaw her care not only for her initial round of outpatient therapy but also for (i) complaints of left upper extremity pain and weakness, ultimately diagnosed as "frozen shoulder," for which she started a course of occupational therapy in January 2009, *see id*. at 520, 676, (ii) renewed complaints in July 2010 of cramping in her left calf and weakness in her left leg, for which she was referred for a new course of physical therapy, *see id*. at 677-78, (iii) complaints commencing in December 2010 of pain along the incision site on her scalp, *see id*. at 714, for which, among other complaints, she was treated at PainCare Surgery Center Somersworth ("PainCare"), a pain management center, *see id*. at 717, and (iv) pain in her right thigh and hip, for which she started a course of physical therapy in January 2011, *see id*. at 734, 739.

On December 13, 2010, Dr. Martinez completed the following:

1. A Function Questionnaire – Upper Extremities, in which he reported, *inter alia*, that the plaintiff's left upper extremity restrictions would constantly interfere with her ability to reach, either above or below the shoulder, frequently interfere with her ability to grip and/or grasp, constantly interfere with her ability to push/pull arm controls, and occasionally interfere with her ability to perform fine manipulation. *See id*. at 684-85.

2. A Symptom Questionnaire – Upper Extremities, and a Pain Questionnaire, in which he indicated that the plaintiff's pain was moderately severe, seriously affecting her ability

4

to function and frequently interfering with her ability to maintain attention and concentration to complete tasks in a timely manner, and that her complaints of pain were consistent with the objective findings. *See id*. at 686, 689.

3. A Fatigue Questionnaire, in which he described the plaintiff's fatigue as moderate, that is, affecting but not precluding her ability to function, indicated that complaints of fatigue were consistent with her diagnosis and clinical findings, and stated that fatigue would frequently interfere with her ability to maintain attention and concentration to complete tasks in a timely manner. *See id*. at 687.

4. A Rest Questionnaire, in which he stated that the plaintiff "requires complete freedom to rest frequently without restriction." *Id*. at 688.

5. An Exertional Limitation Questionnaire, in which he indicated, *inter alia*, that the plaintiff was incapable of sedentary work on a sustained and full-time basis, *see id*. at 690, and an accompanying RFC assessment in which he stated, *inter alia*, that the plaintiff could sit for one hour and stand/walk for one hour in an eight-hour workday, *see id*. at 691-92.

> The administrative law judge essentially rejected these opinions, explaining:
>
> I gave limited weight to the opinions of Dr. Martinez, as not supported by his own records or the record as a whole as noted above. Of note, his opinions are limited to the [plaintiff's] left upper extremity. He opined that the [plaintiff] had moderately severe fatigue and pain consistent with clinical findings. No objective findings were identified. He opined that the [plaintiff] could not do a sedentary job but he offered no explanation as to what functional limitations prevented [her] from that type of work. He noted in November 2010 that the [plaintiff] had a normal sensory examination, normal coordination, reflexes 2+ bilaterally, and only a slight decrease in motor strength in her left arm and left leg consistent with prior exams.

*Id*. at 26 (citations omitted).

The plaintiff argues that the Martinez opinions were entitled to controlling weight. *See* Statement of Errors at 19-24. However, a "medical opinion" by a treating source is entitled to

5

controlling weight only when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [a claimant's] case record[.]" 20 C.F.R. § 404.1527(d)(2); Social Security Ruling 96-2p, reprinted in *West's Social Security Reporting Service* Rulings 1983-1991 (Supp. 2011) ("SSR 96-2p"), at 111.[4] The administrative law judge found the opposite to be the case. *See* Record at 26. The plaintiff challenges that conclusion on multiple bases, namely, that:

1. Dr. Martinez, who followed the plaintiff throughout the course of her recovery from brain surgery and referred her for multiple courses of physical therapy, was qualified to provide a well-supported, medically acceptable opinion. *See* Statement of Errors at 20-21.

2. Dr. Martinez's opinions are consistent with the treating notes and assessment of treating neurologist Karen P. Lauze, M.D., who had noted on October 19, 2009, that the plaintiff had symptoms of weakness, pain, seizures, and headache, could not stand for a prolonged period, could not drive, and was capable of clerical/administrative (sedentary) activity, with no significant improvement expected. *See id.* at 21. Dr. Lauze also noted on February 22, 2011, that the plaintiff continued to have problems with balance and fatigue. *See id.*

3. The administrative law judge mischaracterized the record when he stated that treating surgeon C. Craig Heindel, M.D., indicated in a progress note of March 21, 2011, that his findings on physical examination were "unremarkable[.]" *Id.* at 21 (quoting Record at 25). Instead, the plaintiff points out, Dr. Heindel noted that his physical examination "reveal[ed] her to have a spastic left hemiparesis and incision, which to my palpation appears to be

---

[4] Certain of Dr. Martinez's opinions, such as his opinion that the plaintiff was incapable of performing even sedentary work, are not "medical opinions" to which controlling weight can be given. *See, e.g.*, SSR 96-2p at 112; 20 C.F.R. § 404.1527(a)(2), (e)(2)(3). However, because counsel for the commissioner did not raise that point at oral argument, I have analyzed the Martinez opinions as "medical opinions."

6

unremarkable[,]" while "[h]er neurologic exam is otherwise normal and unchanged." *Id*. at 21 (quoting Record at 775).

4. A physical therapy record dated January 7, 2011, and a PainCare record dated March 16, 2011, record objective findings that are consistent with Dr. Martinez's opinion, *e.g.*, antalgic presentation in posture, significant weakness of the left lower extremity resulting in overuse of the right, an ataxic gait and station, and left lower extremity distal weakness. *See id*. at 22 (citing Record at 719, 739).

5. Dr. Martinez's opinions are supported by the observation of a Social Security caseworker in July 2009 that the plaintiff was very frail and walked unsteadily, slowly, and with difficulty. *See id*. (citing Record at 243).

6. Dr. Martinez's opinions are supported by the plaintiff's testimony at hearing, *see id*. (citing Record at 45, 48-52), as well as the administrative law judge's observation that the plaintiff appeared to be drowsy during the hearing, *see id*. at 23 (citing Record at 25).

7. The administrative law judge mischaracterized the record in stating that the plaintiff denied that she had side effects from her medication in 2009 and 2011 and that Dr. Lauze noted no side effects from Keppra. *See id*. (citing Record at 25). The plaintiff points out that Dr. Heindel noted on March 9, 2009, that she reported that she slept a lot, which she attributed to Keppra, and that Dr. Heindel referred her for a neurological consultation to determine whether she could stop taking the Keppra. *See id*.; *see also* Record at 468). She disputes that Dr. Lauze noted no side effects from taking Keppra, stating that Dr. Lauze instead indicated that she wanted the plaintiff to switch to Topamax. *See* Statement of Errors at 23 (citing Record at 586-87). She adds that, in a note dated September 15, 2009, Dr. Lauze recorded that she reported feeling drowsy on Keppra, and, in a note dated February 22, 2011, Dr.

Lauze noted that she had sedation and referred her for another EEG to determine whether Keppra could be lowered. *See id*. at 23-24 (citing Record at 583, 704.

8. The administrative law judge wrongly inferred that, because the plaintiff had had no seizures since September 2008, she had no functional limitations from the meningioma or any seizure disorder. *See id*. at 24. Yet, Dr. Lauze's February 2011 note and Dr. Heindel's March 2011 note established that she continued to have functional limitations from those disorders and continued to need to take Keppra, which, she contends, has side effects that significantly limit her ability to function in the workplace. *See id*.

Nonetheless, as counsel for the commissioner contended at oral argument, the administrative law judge's rejection of the Martinez opinion is supportable.

First, there is substantial evidence that, as found by the administrative law judge, Dr. Martinez's opinions are not well-supported by clinical and diagnostic findings. Although Dr. Martinez indicated that the plaintiff's moderately severe fatigue and pain were consistent with clinical findings, he did not identify any such objective findings in his questionnaires. *See* Record at 26, 686-87, 689. In addition, as the administrative law judge observed, *see id*. at 22-25, both Dr. Martinez and other treating providers noted complete relief, or significant resolution of, the plaintiff's symptoms in response to multiple courses of physical and occupational therapy and other treatment, *see, e.g., id*. at 444 (April 22, 2009, note of Dr. Martinez indicating that plaintiff no longer using a cane; gaining lower extremity strength), 465 (May 13, 2009, note of Dr. Heindel indicating that plaintiff was treating her headaches with Aleve with good result, continued to have improvement with no more pain in her left calf, that she still had some pain in joint but it was dramatically improved, and she had continuing improvement in use of her left arm and leg), 504 (March 27, 2009, physical therapy note indicating that plaintiff was discharged

to home therapy after all established goals had been achieved; that she denied pain, and that her bilateral lower extremities and trunk were within functional limits, despite continued weakness), 574 (September 16, 2009, note of Dr. Heindel indicating that plaintiff was "doing quite well" and her "only complaint is pain in her left foot"), 583 (September 15, 2009, note of Dr. Lauze indicating that the plaintiff's foot pain was mild and not severe enough for her to want medications), 676 (October 5, 2009, note of Tadhg O'Gara, M.D., indicating that pain from the plaintiff's "frozen shoulder" was much better following treatment, although her motion was "still limited," and that "frozen shoulder can take up to a year to improve and she is currently following a normal course"), 682-83 (October 21, 2010, note of Dr. Martinez recording improvement in left leg weakness and aching following new course of physical therapy), 731 (August 4, 2009, physical therapy note reflecting that plaintiff was discharged to home care with respect to frozen shoulder after she met all goals and decreased her pain to nearly zero for all activities of daily living and work activities).

At oral argument, the plaintiff's counsel explained that he relied on the most recent treating notes of record as support for Dr. Martinez's finding that the plaintiff had a less than sedentary work capacity, specifically, (i) the January 7, 2011, physical therapy note stating that the plaintiff "demonstrate[d] antalgic presentation in posture, [and] significant weakness of the left lower extremity resulting in overuse of the right[,]" *id*. at 739, (ii) the March 16, 2011, PainCare note stating that the plaintiff had an ataxic gait and station and left lower extremity distal weakness, *see id*. at 719, and (iii) and the March 21, 2011, note of Dr. Heindel that the plaintiff contends the administrative law judge misconstrued, *see id*. at 775.

As the plaintiff points out, *see* Statement of Errors at 21, Dr. Heindel did find, on physical examination on March 21, 2011, that she had "a spastic left hemiparesis and incision,

9

which to my palpation appears to be unremarkable[,]" with her "neurologic exam . . . otherwise normal and unchanged[,]" Record at 775. As the plaintiff's counsel suggested at oral argument, the word "unremarkable" is most reasonably construed as modifying the word "incision." Therefore, in characterizing the entire examination as "unremarkable," the administrative law judge overlooked the finding of a spastic left hemiparesis. *See id*. at 25. Yet, nothing turns on the error. The plaintiff argues that, per a dictionary definition, a spastic left hemiparesis could reasonably be expected to result in her complaints of pain, muscle spasm, limitation of motion, and muscle weakness. *See* Statement of Errors at 22-23. Nonetheless, during the visit at issue, the plaintiff complained only of discomfort and pain in the right side of her head at her incision site and some muscle spasms in her left leg, which had been present for a long time and had been helped by physical therapy and medication. *See id*. at 775.

It is not self-evident that the 2011 physical therapy and PainCare notes support Dr. Martinez's opinion that the plaintiff had a *less than sedentary* work capacity. However, even if they do, the fact that some evidence of record supports a treating source's opinion does not compel the acceptance of that opinion in circumstances in which other evidence of record contradicts it. *See, e.g., Brown v. Astrue*, No. 2:10-cv-27-DBH, 2010 WL 5261004, at *2 (D. Me. Dec. 16, 2010) (rec. dec., *aff'd* Jan. 4, 2011) (when treating source's conclusions were inconsistent with those of other medical professionals, "[t]he fact that they may also be consistent with some of the other medical evidence in the record . . . does not mean that the administrative law judge must adopt those conclusions rather than the opposing ones").

At oral argument, the plaintiff's counsel underscored the administrative law judge's purported error in finding that "[t]he [plaintiff] has had no seizures since September 2008, suggesting strongly that her functional limitations from the meningioma and any seizure disorder

are essentially non-existent." Record at 26 (citation omitted). The plaintiff's counsel noted that (i) J.H. Hall, M.D., a Disability Determination Services ("DDS") nonexamining consultant, had indicated that the plaintiff continued to be at risk for seizures, *see id*. at 649, and, (ii) as a result of her ongoing seizure risk, she continued to be prescribed Keppra, a seizure control medication that, he contended, caused her to suffer from severe drowsiness.

Any error in failing to note the plaintiff's ongoing seizure risk was harmless. Dr. Hall found that, as a result of that risk, the plaintiff needed to avoid even moderate exposure to hazards such as unprotected heights and dangerous machinery, *see id*., and the administrative law judge adopted that finding in making his RFC determination, *see* Finding 5, *id*. at 20. The plaintiff's counsel did not suggest that his client had restrictions other than those set forth by Dr. Hall as a result of her ongoing seizure risk.

With respect to fatigue, the administrative law judge reasonably construed Dr. Lauze's June 2, 2009, progress note as indicating that the plaintiff had denied side effects of Keppra, *see id*. at 585 ("No SE [side effects] or seizures on Keppra."), and a March 16, 2011, PainCare note as indicating that she denied any side effects of medication, *see id*. at 718 ("**Side Effects**: denies"). In any event, to the extent that the record elsewhere reflects intermittent complaints of fatigue, which the plaintiff sometimes attributed to Keppra, it is not clear that the condition was in fact attributable to Keppra *versus* anemia or insomnia or that the fatigue was present on an ongoing basis.

On March 9, 2009, the plaintiff reported to Dr. Heindel that she was sleeping "a lot[,]" which she attributed to taking Keppra. *Id*. at 468. Dr. Heindel stated that he would obtain an EEG to see if it was possible to stop the Keppra. *See id*. However, he did not indicate that he believed that the Keppra was the cause of the fatigue. *See id*. Although Dr. Martinez noted

11

complaints of fatigue in March and April 2009, he did not attribute them to Keppra and indicated that the condition was improving. *See id*. at 444, 446. Dr. Lauze did note, on September 15, 2009, that the plaintiff was "drowsy on current Keppra dose." *Id*. at 583. However, in the context of receiving Vitamin B-12 shots to treat anemia in February and April 2010, the plaintiff denied fatigue and stated that her energy level was good. *See id*. at 665-66. On January 20, 2011, Dr. Martinez noted that the plaintiff had difficulties sleeping, had not tried any sleeping agents, and had fatigue when she had insomnia. *See id*. at 709. The plaintiff complained to Dr. Lauze, on February 22, 2011, of continued fatigue. *See id*. at 704. While Dr. Lauze questioned whether the plaintiff's sedation was secondary to Keppra, this was not tantamount to a definitive finding that it was. *See id*. In a March 16, 2011, visit to PainCare, the plaintiff denied not only side effects of medication but also fatigue. *See id*. at 718.[5] While the plaintiff's counsel stated, at oral argument, that Keppra is known to cause drowsiness, he identified no record evidence supporting that proposition.

  Any error in assessing the effects of Keppra, accordingly, is harmless.

  The administrative law judge also supportably found that Dr. Martinez's opinions were inconsistent with other substantial evidence of record, including the evidence described above demonstrating significant relief of her symptoms following treatment, Dr. Lauze's opinion that her only restrictions as of October 19, 2009, were against driving or prolonged standing, *see id*. at 579, and that she was capable of clerical/administrative (sedentary) activity, *see id*. at 580, and Dr. Martinez's own note of March 11, 2009, stating that the plaintiff's "condition continues to improve with ongoing physical therapy treatments" and that "[i]t remains our hope/expectation she will be capable of returning to work in the near future[,]" *id*. at 771. The fact that other

---

[5] As the administrative law judge also suggested, *see* Record at 24, there is a seeming inconsistency between the plaintiff's complaints of drowsiness and sleeping a lot on Keppra, and her reported difficulties sleeping at night.

12

evidence of record, such as the plaintiff's hearing testimony, may have been consistent with Dr. Martinez's opinions did not undermine that conclusion. *See, e.g.*, *Brown*, 2010 WL 5261004, at *2.[6]

The administrative law judge, therefore, did not err in declining to give controlling weight to the Martinez opinions.

## B. Credibility Determination

The plaintiff finally challenges the administrative law judge's credibility determination on the basis that, in contravention of the commissioner's rules and regulations, he failed to take into consideration her work record. *See* Statement of Errors at 24-25; Social Security Ruling 96-7p, reprinted in *West's Social Security Reporting Service* Rulings 1983-1991 (Supp. 2011) ("SSR 96-7p"), at 137 (assessment of the credibility of an individual's statements must be based on all evidence in the case record, including "prior work record and efforts to work"). She notes that, prior to her alleged onset date of disability, she worked two full-time jobs plus overtime on Saturdays. *See* Statement of Errors at 25; Record at 38-39; *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983) ("A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability.").

Nonetheless, as counsel for the commissioner argued at oral argument, any error is harmless. The administrative law judge found a number of discrepancies between the plaintiff's allegations and the objective evidence of record. For example, he noted that, despite her

---

[6] The administrative law judge did not consider either (i) the observations of a Social Security caseworker in July 2009 that the plaintiff was very frail and walked unsteadily, slowly, and with difficulty, *see* Record at 243, or his own observations at hearing that the plaintiff appeared drowsy, *see id.* at 25, to bolster her case or Dr. Martinez's opinions. He reasonably suggested that the plaintiff's presentation at the Social Security office in July 2009 was inconsistent with other evidence of record, including notations in April 2009 that she had a normal gait and in September 2009 that she walked well and had good gross strength. *See id.* at 25, 574, 587. He was unpersuaded that the plaintiff's apparent drowsiness at her hearing was a side effect of Keppra, as she had testified. *See id.* at 25. As noted above, that finding is supported by substantial evidence.

apparent drowsiness during her hearing, which she attributed to her medication, and her testimony regarding sensitivity to noise and light, she denied side effects of medication in 2009 and in 2011, and there was no objective evidence to validate her complaints that talking, noise, and doing paperwork made her head and temple hurt. *See* Record at 25. There is no reason to believe that discussion of the plaintiff's work record would have made any difference.

## II. Conclusion

For the foregoing reasons, I recommend that the decision of the commissioner be **AFFIRMED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 2nd day of July, 2012.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge